Shlomo Y Hecht
Shlomo Y Hecht PA
3076 N Commerce Pkwy
Miramar, FL 33025
954-861-0025
*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| OJCOMMERCE, LLC, | : | **COMPLAINT** |
| *Plaintiff* | : | **AND DEMAND FOR JURY TRIAL** |
| | : | |
| vs. | : | Case No. 2:26-cv-372 |
| | : | |
| ITAMAR ARONOV, | : | |
| *Defendant* | : | |

_____ :

Plaintiff OJCommerce, LLC ("OJC"), of 3076 N Commerce Parkway, Miramar, Broward County, Florida 33025, by and through undersigned counsel, hereby files this Complaint against Defendant Itamar Aronov ("Aronov" or "Defendant"), of 402 Marc Dr, Toms River, New Jersey 08753, pursuant to Fed. R. Civ. P. 3, and states and alleges the following:

### BACKGROUND

1.      Plaintiff OJC is a Delaware limited liability company with its principal place of business in Broward County, Florida. OJC's single member resides in Florida. OJC is an online retailer engaged in interstate commerce and sells consumer goods to customers.  OJC is a citizen of the State of Florida.

2.      Defendant Itamar Aronov is and was during the relevant time a representative of HYC Logistics, Inc.

3.      Defendant Aronov maintains his home and resides at 402 Marc Dr, Toms River, New Jersey 08753 and is a citizen of the State of New Jersey.

1

4.      HYC Logistics, Inc. – which is not a party to this action – is a corporation that is engaged in the business of providing trucking services to the public at large within the United States.

5.      This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332, as the parties, OJC and Aronov, are completely diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is proper in this District as Defendant resides in this District.

**INTRODUCTION**

7.      This action arises from a calculated fraud scheme orchestrated by Defendant Itamar Aronov, culminating in the wrongful seizure of nearly one million dollars of Plaintiff OJC's merchandise to coerce payment for fraudulent invoices. Under Aronov's direction, a standard logistics agency relationship became a vehicle for systematic deception, where Aronov fabricated charges using falsified documents to collect hundreds of thousands of dollars in fraudulent charges from OJC, and ultimately held OJC's business hostage.

8.      The scheme began in 2022. To induce OJC into establishing a business relationship with his company, HYC Logistics, Inc. ("HYC"), Aronov personally and repeatedly made explicit representations about HYC's pricing and billing practices. These representations were knowingly false when made.  To induce OJC into his fraudulent scheme, Aronov repeatedly assured OJC that HYC billed all accessorial charges "at cost"and made no profit on those charges.

9.      In reality, Aronov knew these promises were false. He was fully aware that a substantial portion of HYC's revenue was derived from imposing arbitrary and fictitious fees on its customers—a practice he immediately applied to OJC.

2

10.    Aronov further participated in the scheme in which HYC and its agents created falsified per-diem documents to obtain waivers from shipping carriers, all while billing OJC and other customers for per-diem fees that were never incurred.

11.    When OJC confronted Aronov with the billing irregularities, Aronov did not correct the charges.

12.    Instead, in December 2022—after OJC caught on to the fraud and demanded HYC cease all activities —Aronov did not cease his scheme—he retaliated.

13.    He directed HYC's trucking agent, 562 Express, Inc. ("562"), to wrongfully seize nine (9) of OJC's shipping containers, divert them to 562's yard, and hold them for ransom to coerce payment of HYC's fabricated fees.

14.    To accomplish this, Aronov caused 562 to misrepresent to port authorities that it continued to act on OJC's behalf, even though Aronov knew that all authority to act for OJC had been expressly revoked.

15.    Through this deception, Aronov caused nearly one million dollars' worth of OJC's pre-sold holiday inventory to be seized, causing OJC substantial financial losses, loss of customer goodwill, and significant storage charges thereafter imposed by HYC.

16.    OJC brings this action to hold Aronov personally liable for the fraudulent scheme he participated in and executed—both to induce OJC into the scheme with HYC in the first place, and to extract unauthorized payments through fabricated billing and the wrongful taking of OJC's property. While a federal jury has already found Aronov's company, HYC, liable for these same deceptive acts in Tennessee, Aronov himself, a New Jersey citizen —one of the primary architects of the fraud—has yet to be held personally accountable.  Through this Complaint, OJC seeks to do precisely that.

3

## FACTS COMMON TO ALL COUNTS

17.    OJC is an online retailer that sells a variety of products within the continental United States.

18.    OJC also imports products via ocean freight shipping containers from Asia for sale within the continental United States.

19.    As part of its business, OJC hires logistics companies to transport shipping containers from California ports to warehouses in California.

**A.    The Bait: Aronov's False Promises**

20.    In August 2022, OJC and HYC entered into a business relationship with HYC to provide logistical services related to the shipment of OJC's international shipping containers.

21.    As part of that arrangement, OJC designated HYC to act as an "agent" of OJC.

22.    HYC was to act as an agent for OJC in the shipment of its containers.

23.    Specifically, HYC was to act as an agent of OJC, and pick up OJC's containers at the port and deliver them to OJC's warehouses.

24.    Prior to and after entering into a business relationship with HYC in August 2022, Aronov repeatedly communicated with OJC about HYC's billing practices, in order to induce OJC to enter into his scheme with HYC and continue to utilize HYC's logistical services.

25.    During those communications, which took place before OJC unknowingly entered to Aronov's scheme with HYC, Aronov made materially false misrepresentations to OJC including falsely stating that HYC's existing practice was to bill all accessorial charges at cost and that it did not make any profit on those charges.

26.    At the time he made these statements, Aronov knew HYC was not billing accessorial charges at cost and that HYC fabricated fees that it charged to its customers, which

would include OJC.

27.     OJC relied on that statement of fact about HYC's accessorial charges when (unknowingly) entering into Aronov's scheme with HYC, because this assurance meant OJC would incur only those accessorial charges actually imposed by third parties.

28.     But Aronov's representation regarding HYC's accessorial charges was false.

29.     Aronov knew that HYC imposed arbitrary accessorial fees on its customers, even when no such charges were incurred from third parties.

30.     In fact, a significant portion of HYC's revenue came from these fictitious and arbitrary accessorial charges that HYC and Aronov charged their customers.

31.     In another example of Aronov's fraudulent promises, on August 24, 2022, Aronov sent an email to Jacob Weiss, a representative of OJC, confirming his prior representations that HYC billed its accessorial charges at cost, and did not make any profit on such charges.  A true and correct copy of that email is hereby attached as **Exhibit A**.

**B.      The Fraud in Action: Systematic Overbilling and Fake Fees**

32.     Every invoice HYC issued to OJC contained fabricated fees and arbitrary accessorial charges that HYC never incurred.

33.     HYC - under the direction of Aronov -  invented arbitrary and fictitious accessorial charges on OJC's invoices.

34.     On multiple occasions, HYC  - under the direction of Aronov -  billed OJC tens of thousands of dollars for per diem fees that were purportedly charged by the freight carriers, despite the fact that HYC never incurred any of those charges.

35.     For example, on September 23, 2022, Aronov sent to OJC via email the first batch of 41 invoices totaling $58,195. Only $34,890 of those charges were for trucking services.

Those invoices included at least $6,150 in congestion fees, an accessorial charge arbitrarily charged to OJC, without ever incurring such a fee from any third party.

36.    Similarly, on October 21, 2022, Aronov sent to OJC via email the second batch of 47 invoices totaling $76,728. Only $35,437.50 of those charges were for trucking services.

37.    Similarly, on October 27, 2022, Aronov sent to OJC via email the third batch of 49 invoices totaling $80,060. Only $36,015 of those charges were for trucking services.

38.    Even worse, Aronov, personally directed others, perpetuating a scheme by which they would use Photoshop and other software to fabricate documents to secure waivers for per diem fees from the ports, while simultaneously billing OJC for those exact same non-incurred fees.

39.    As a result of HYC's Photoshop operation, Aronov knew that all per diem fees were always waived by the carriers 100% of the time.

40.    Despite receiving multiple email notifications from the freight carriers confirming that the per diem charges were waived, Aronov still issued invoices and billed OJC for those very same charges.

41.    On November 21, 2022, Aronov sent to OJC via email the fourth batch of 90 invoices totaling $74,640. Only $16,905 of those charges were for trucking services.  This batch included at least $43,880 in fraudulent per diem charges.

42.    Similarly, on November 23, 2022, Aronov sent to OJC via email the fifth batch of 6 invoices totaling $6,840. Only $4,410 of those charges were for trucking services.

43.    OJC was unaware of Aronov's scheme with others to fabricate documents in order to defraud OJC, the ports, the carriers, and HYC's other customers.

44.    Aronov was fully aware that these per diem charges to OJC were fraudulent.

45.     Aronov's charging of fake per diem fees was a standard practice, with other HYC customers also falling victim to this fabricated per diem charge scheme.

**C.     OJC Discovers the Fraud and Terminates the Relationship**

46.     What's more, on several occasions throughout the Fall and early Winter of 2022, OJC repeatedly notified Aronov of its concerns regarding HYC's fees, yet Aronov continued to impose fabricated fees on OJC.

47.     For example, on October 6, 2022, after OJC received a batch of invoices from HYC, Jacob Weiss, a representative of OJC, immediately advised Aronov that these invoices are "pretty bad," and immediately scheduled a conference call for October 7, 2022 to discuss the OJC's issues with the fees that Aronov and HYC were charging.

48.     A subsequent meeting on the same subject was held on October 31, 2022.

49.     After those meetings, OJC reconciled the invoices, and on November 18, 2022, OJC emailed Aronov a detailed spreadsheet identifying some of the disputed charges.

50.     In December 2022, OJC imported four containers to the APM Terminals in Los Angeles California, which were identified by container Nos. GLDU7208342, MSMU5351302, FSCU8375189, FSCU6621030 (collectively, the "APM Containers").

51.     In December 2022, OJC also imported five containers to the PCT Terminals in Long Beach California, which were identified as container Nos. FBLU0221540, UETU5851068, WHSU5838796, WHSU6872630, WHSU6598895 (collectively, the "PCT Containers").

52.     The PCT Containers and the APM Containers are collectively referred to herein as "the Containers," and they contained products that OJC had imported for sale in the United States. True and correct copies of the bills of lading for all the Containers are hereby attached as **Exhibit B.**

53.    On December 5, 2022, Weiss again emailed Aronov about per diem and bobtail disputes.  In response, Aronov falsely represented to OJC that the per-diem charges were valid and not subject to dispute.

54.    In reality, none of these per-diem charges were valid, and Aronov knew they were invalid when he asserted otherwise.

55.    Within a matter of weeks after learning of Aronov's and HYC's fraudulent fees and their refusal to correct them, OJC terminated its agency and business relationship with HYC on December 13, 2022.

56.    OJC terminated its agency relationship with HYC by sending an email dated December 13, 2022 to Aronov, among others at HYC.  A true and correct copy of OJC's emails to Aronov and HYC about cancelling all appointments and the parties' agency relationship are attached hereto as **Exhibit C**.

57.    Instead of immediately stopping all agent activities for OJC, Aronov and HYC worked without authority with their trucking agent 562 Express, Inc. ("562") to take the Containers belonging to OJC and hold them for ransom in an effort to extort OJC into paying HYC for its fraudulent charges.

58.    To that end, between December 13 and 14, 2022, Aronov willfully directed 562 to retrieve the Containers through deception and without authority, including Containers marked for holiday deliveries to OJC's customers.

59.    After OJC terminated its relationship with HYC, on December 13, 2022, Aronov sent to OJC via email another batch of 68 invoices totaling $82,115. Only $41,895 of those invoices were for trucking services.  This batch included at least $5,335 in fraudulent per diem charges.

60.     Thereafter, on December 15, 2022, Aronov sent to OJC via email the last batch of 12 invoices totaling $14,465. Only $6,615 of those charges were for trucking services.

**D.     Aronov Takes the Containers in Defiance of OJC's Demands**

61.     Listed below is the timeline showing Aronov's deceptive and unfair taking of the Containers *after* the cancellation of any alleged authority that Aronov, HYC or 562 had to pick up or transport the Containers:

- **December 13, 2022**:

  o   11:59 AM:[1] OJC demands that Aronov and HYC cancel all appointments to pick up OJC's Containers.

  o   12:23 PM: After receiving no response to its 11:59 AM email, OJC reiterates its prior request that Aronov and HYC "cancel ALL pending appointments."

  o   4:00 PM: After *four hours* without a response or confirmation of its cancellation demands, OJC again demands that Aronov and HYC confirm that all appointments are canceled so that OJC can secure its own appointments.

  o   5:53 PM: After nearly *six hours* without a response from Aronov or HYC, OJC advises Aronov and HYC again that it is "not to pick up any containers from OJCommerce at any port or terminal" and reiterates that "[a]ny authority previously given for such pickups, is hereby revoked."

  o   5:55 PM:  *Six hours* after OJC first demanded that all appointments to pick up its Containers be canceled, 562 picked up and stole, at Aronov and HYC's direction, OJC's first shipping container, Container No. FBLU0221540.

  o   6:12 PM: 562 picked up and stole, at Aronov and HYC's direction, OJC's Container No. UETU5851068.

  o   11:08 PM: *Eleven hours* after OJC first demanded that all appointments to pick up the Containers be canceled, 562 picked up and stole, at Aronov and HYC's direction, OJC's Container No. FSCU6621030.

- **December 14, 2022**:

---

[1] All times listed are Eastern time zone, where OJC is located.  The times received from the Terminals for the illegal pickups by 562 were in local, Pacific time and have been converted to Eastern for ease of reference.

o  3:36 AM:  *Fifteen-and-a-half hours* after OJC first demanded that all appointments to pick up the Containers be canceled, 562 picked up and stole, at Aronov and HYC's direction, OJC's Container No. GLDU7208342.

o  4:03 PM: *28 hours* after OJC first demanded that all appointments to pick up the Containers be canceled, 562 picked up and stole, at Aronov and HYC's direction, OJC's Container No. WHSU5838796.

o  4:38 PM:  After over *28.5 hours* without a response from Aronov or HYC, OJC reiterated again its termination and noted that "YOU [AR]E COMPLETELY IGNORING and not responding" to OJC's prior emails.  This time, OJC also copied 562 on the email chain.

o  5:55 PM: *30 hours* after OJC first demanded that all appointments to pick up the Containers be canceled, 562 picked up and stole, at Aronov and HYC's direction, OJC's Container No. MSMU5351302.

o  7:03 PM:  *31 hours* after OJC first demanded that all appointments to pick up the Containers be canceled, 562 picked up and stole, at Aronov and HYC's direction, OJC's Container No. WHSU6598895.

o  7:40 PM: Nearly *32 hours* after OJC first demanded that all appointments to pick up the Containers be canceled, 562 picked up and stole, at Aronov and HYC's direction, OJC's Container No. FSCU8375189.

o  10:11 PM:  Over *34 hours* after OJC first demanded that all appointments to pick up the Containers be canceled, 562 picked up and stole, at Aronov and HYC's direction, OJC's Container No. WHSU6872630.

62.    During these two days, Aronov refused to communicate with OJC and did not respond to any of OJC's emails.

63.    Aronov ignored and did not communicate with OJC at all until after the Containers were in HYC's possession.

64.    Instead, as shown above, Aronov directed 562 to take OJC's Containers after all authority to do so had been revoked.

65.    Neither Aronov, HYC, nor 562 had any authorization from OJC to retrieve the Containers, retain them, or retain their contents.

66.    To the contrary, on December 13, 2022, OJC revoked any alleged authority for

Aronov, HYC, and 562 to act on OJC's behalf.

67. Aronov never intended for the Containers to be delivered. His sole purpose was to deprive OJC of its property and use nearly a million dollars in inventory as leverage to compel payment of fraudulent fees.

68. Between December 13 and 14, 2022, Aronov contacted Antonio Hernandez of 562 multiple times by telephone in furtherance of the scheme.

69. In those phone conversations, Aronov instructed Hernandez to schedule and retrieve OJC's Containers from the ports and to retain them rather than release them to OJC.

70. In those conversations, Aronov instructed Hernandez to change the destination of all Containers from their intended delivery locations to 562's yard.

71. In those conversations, Aronov instructed Hernandez to take the Containers without OJC's knowledge or consent because OJC refused to pay HYC's fraudulent fees.

72. This deception included misleading the ports into believing that 562—HYC's agent—was authorized to act on behalf of OJC, despite Aronov knowing that OJC had already terminated all such authority.

73. This deception also included Aronov scheduling, or causing to be scheduled, pickup appointments with the ports while pretending to act on OJC's behalf.

74. This deception further involved having 562 pretend to retrieve the Containers on OJC's behalf and deliver them to an unauthorized destination.

75. Aronov also misled OJC by concealing that he was using HYC's already-terminated agency status to take possession of the Containers.

76. Aronov knew that if OJC alerted the port authority to his and HYC's scheme, the port would not release the Containers to HYC or 562.

11

77.    These actions were taken with the intent to mislead port authorities into releasing the Containers to 562, because ports will not release Containers without the shipper's authorization.

78.    After OJC discovered the scheme, on December 15, 2022, OJC sent a letter informing Aronov that he had no authorization to pick up any of the Containers and demanded their immediate return. A true and correct copy of the demand letter is hereby attached as **Exhibit D** (the "Demand Letter").

79.    In its Demand Letter, OJC reiterated to Aronov that the Containers contained pre-ordered holiday products, and OJC's customers were counting on and waiting for their delivery.

80.    Instead of immediately stopping all agent activities for OJC, Aronov worked with representatives of HYC and 562 to take the Containers belonging to OJC and hold them for leverage to coerce OJC into paying HYC for its fraudulent charges.

81.    This was done with the intent to cause OJC injury and to extort OJC into paying HYC's fraudulent charges.

82.    To that end, on December 15, 2022, HYC claimed that OJC's total balance on all its outstanding invoices was $307,310.00, and demanded the amount be paid in full, as a precondition for the release of the Containers.

83.    That balance included at least $49,215.00 in fabricated per-diem charges that HYC billed to OJC but did not incur from any carrier.

84.    Only after multiple motions to compel discovery were granted, HYC later acknowledged that not a single penny was charged by – nor paid by HYC or its agents to – any shipping carriers for the per diem fees that HYC charged to OJC.

85.     It was also discovered that Aronov had participated in passing off fabricated per diem documents as authentic, billing OJC for those fabricated charges, and withholding the Containers based on OJC's refusal to pay the fabricated fees.

86.     As a result, OJC suffered significant harm and lost sales when its customers were unable to get delivery of their pre-ordered holiday items from OJC.

87.     A true and correct copy of a schedule of the contents of the Containers, and their values totaling $939,788.35, is hereby attached as **Exhibit E**.

88.     OJC was also harmed when Aronov and HYC charged hundreds of thousands of dollars in storage fees on the Containers, after it took possession of them through fraud and false pretenses.

89.     It was HYC's and 562's routine practice to fabricate documents related to per-diem charges to secure waivers from the shipping carriers.

90.     HYC did not incur any of the per-diem charges it billed to OJC and therefore had no basis to charge OJC for them.

91.     In addition to those per diem charges, the $307,310.00 balance included inflated and arbitrary accessorial charges, including but not limited to, $21,600 in congestion fees, $29,750 in bobtail fees, and over $16,000 in overcharged chassis fees, in addition to stop off, storage, dry run, overweight, and prepull charges.

92.     Out of the $393,042.50 total invoiced by HYC to OJC, only $105,840.00 was for actual freight charges.

93.     73% of HYC's charges were not freight charges at all, but accessorial charges.

94.     Lawsuits were filed against HYC, 562, and others, including Aronov, in the United States District Court for the Western District of Tennessee (Case Nos. 2:23-cv-2050 and

2:23-cv-0226 (Consolidated)) ("W.D. Tenn. Action").

95.    On August 5, 2024, Aronov was dismissed from the W.D. Tenn. Action for lack of personal jurisdiction over him in Tennessee.

96.    On December 20, 2024, a unanimous jury in the W.D. Tenn. Action found that HYC engaged in an unfair or deceptive act or practice against OJC and awarded damages to OJC in the amount of $701,508.81[2].

97.    The jury also found that HYC committed intentional and/or reckless misrepresentation against OJC and awarded damages to OJC in the amount of $238,279.45.

98.    Aronov was not a party to the W.D. Tenn. Action when it went to trial in December 2024.

99.    Because Aronov was dismissed for lack of personal jurisdiction, the W.D. Tenn. Action did not and could not adjudicate OJC's claims against Aronov personally.

100.    Accordingly, no judgment has been entered as to Aronov's personal liability for the conduct described herein.

101.    OJC now brings this lawsuit against Aronov to hold him personally accountable for his part in the fraud scheme against OJC and others.

**COUNT I – FRAUD**

102.    OJC repeats and realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

103.    Aronov directed HYC to issue fraudulent invoices to OJC.

104.    On at least September 23, October 6, 21, and 27, November 21 and 23, and December 13 and 15, 2022, Aronov caused OJC to be charged for fake fees, despite knowing that such fees were invalid, not incurred by HYC, or waived by the freight carriers.

---

[2] The district court later vacated this part of the jury's verdict.

105.    Aronov also participated in a scheme to fabricate per-diem documents to obtain carrier waivers while still charging OJC and other customers for those per-diem fees.

106.    Aronov instructed 562 to misrepresent to port authorities that it was acting as OJC's agent in order to wrongfully obtain possession of OJC's Containers.

107.    Aronov also misrepresented his intent to pick up the Containers by cutting off all communications with OJC after OJC terminated HYC's agency authority, in order to wrongfully obtain possession of the Containers.

108.    Aronov was acting without authorization from OJC when instructing 562 to schedule appointments to pick up the Containers on behalf of OJC, when he had absolutely no authority from OJC to do so.

109.    Aronov acted under false pretenses by sending 562 to the ports and misrepresenting it as a trucking company operating as OJC's agent.

110.    Aronov directed 562 to pick up the Containers and deliver them to unauthorized destinations despite knowing that OJC had terminated all agency authority.

111.    Aronov's duties not to knowingly misrepresent material facts, not to fabricate billing documents, and not to wrongfully seize OJC's property exist independently of any contractual obligations.

112.    OJC suffered damages including lost sales and harm to its goodwill and business reputation in an amount exceeding $75,000, exclusive of interest and costs.

113.    OJC was also injured in the form of storage fees charged by HYC, in a sum exceeding $75,000, exclusive of interest and costs.

114.    Aronov's fraudulent conduct described herein was willful and malicious, undertaken with the intent to harm OJC and in conscious disregard of OJC's rights. His actions

deprived OJC of the contents of its Containers and resulted in substantial overbilling of fraudulent fees. Accordingly, OJC is entitled to punitive damages.

115.    Aronov's conduct was wanton and in reckless disregard of a high probability of harm to OJC, satisfying the standard for punitive damages under N.J.S.A. 2A:15-5.12.

WHEREFORE, OJC demands monetary damages for loss of the contents of the Containers, and sales therefrom, and loss of OJC's goodwill and reputation, in a sum exceeding $75,000, exclusive of interest and costs, all of the storage fees charged by HYC on those Containers, incidental damages, punitive damages, in an amount to be determined at trial, costs of this litigation, prejudgment interest, and any other relief this Court finds just and proper.

### COUNT II – FRAUDULENT INDUCEMENT

116.    OJC repeats and realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

117.    In August 2022, OJC hired HYC as an agent to provide logistical services to OJC.

118.    Aronov's duties not to knowingly misrepresent material facts, not to fabricate billing documents, and not to wrongfully seize OJC's property exist independently of any contractual obligations.

119.    During the negotiations between OJC and HYC, in August 2022, Aronov made knowingly false statements of fact to OJC regarding billing practices to induce OJC into Aronov's scheme with HYC.

120.    Aronov knew the billing practices he promised to OJC were false and were provided for the sole purpose of inducing OJC into Aronov's fraud scheme.

121.    Aronov communicated those billing practices with reckless disregard for their truth or accuracy.

122.    Aronov intended for OJC to rely on those billing practices in deciding to allow HYC to act as OJC's agent, and continue the agency relationship with HYC.

123.    Without knowing of the falsity of the billing practices at the time, OJC relied on Aronov's false representations and entered into the agency relationship with HYC based on the promised billing practices and that HYC and Aronov would be honest in their dealings.

124.    Aronov made materially false misrepresentations to OJC including a false statement that HYC bills all accessorial charges at cost, and makes no money on those charges.

125.    OJC relied on HYC's representation regarding its accessorial charges when entering into an agency relationship with HYC. Aronov's assurance meant that OJC would incur only those accessorial charges imposed by a third party. This promise was fundamental to OJC's decision to do business with HYC.

126.    OJC's reliance on Aronov's promises was reasonable under the circumstances, and OJC had no reason to disbelieve Itamar Aronov's representations at that time.

127.    OJC suffered damages including lost sales and loss of OJC's goodwill and reputation.

128.    OJC was also injured in the form of storage fees charged by HYC.

129.    Aronov knew that his representations to OJC about billing practices were false, and yet he induced OJC into relying on them anyway. Aronov's fraudulent inducement of OJC was done with malice, whereby he intended to cause injury to OJC, and has willfully and consciously disregarded OJC's rights to HYC's economic advantage. Through his fraudulent conduct, Aronov also knowingly acted to cause OJC oppression, as has cruelly and unjustly robbed OJC of the contents of its Containers and caused OJC to be charged fabricated fees. Accordingly, OJC is entitled to punitive damages from Aronov for his fraudulent activities.

130.    Aronov's conduct was wanton and in reckless disregard of a high probability of harm to OJC, satisfying the standard for punitive damages under N.J.S.A. 2A:15-5.12.

WHEREFORE, OJC demands monetary damages for loss of the contents of the Containers, and sales therefrom, and loss of OJC's goodwill and reputation, in a sum exceeding $75,000, exclusive of interest and costs, all of the storage fees charged by HYC on those Containers, incidental damages, punitive damages, in an amount to be determined at trial, costs of this litigation, prejudgment interest, and any other relief this Court finds just and proper.

### COUNT III – DECEPTIVE TRADE PRACTICES

131.    OJC repeats and realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

132.    This is an action for a violation of the New Jersey Consumer Fraud Act ("NJCFA"), under N.J.S.A. 56:8-2.

133.    OJC was acting as a consumer of services that HYC offered to the public at large, namely, HYC's logistical services to deliver containers from the ports to warehouses across the United States.

134.    HYC's services are not unique to a specific industry, as HYC's services are offered to any person that is importing cargo or using cargo trucking services within the United States.

135.    Additionally, OJC used the logistics services from HYC for its own use in transporting goods and not for resale as a logistics provider, and thus acted as a consumer of HYC's services within the meaning of the NJCFA.

136.    Aronov engaged in unconscionable commercial practices in his dealings with OJC, as described herein.

137.    Aronov engaged in deception by making false promises to OJC about billing practices and services that it would receive from HYC.

138.    Aronov's conduct included fraudulently adding fictitious charges to OJC's invoices, and demanding payment for them.

139.    Aronov's conduct also included acting without authority, by misleading the port authorities that HYC and 562 were acting as agents of OJC, after the agency relationship was terminated.

140.    Aronov's conduct also included omission of material facts, by instructing 562 to mislead the port authorities and OJC about HYC's intent to take possession of OJC's Containers.

141.    All of Aronov's conduct was done willfully and fraudulently with malice by Aronov, as described herein.

142.    Aronov was located in New Jersey when he made the misrepresentations.

143.    Aronov's negotiations, billing, and communications were directed by him from New Jersey.

144.    Aronov's deceptive conduct emanated from New Jersey.

145.    As a result of Aronov's conduct, OJC suffered loss of inventory, lost sales, and harm to its goodwill and reputation, in a sum exceeding $75,000, exclusive of interest and costs.

146.    As a result of Aronov's conduct, OJC was also harmed in the form of incurring significant storage fees imposed by HYC on those Containers in a sum exceeding $75,000, exclusive of interest and costs.

147.    As a result of Aronov's NJCFA violations, OJC suffered an ascertainable loss, including from Aronov's fabricated fees, storage fees billed after the wrongful seizure of the Containers, and lost value of the inventory listed on **Exhibit E**.

19

WHEREFORE, OJC demands monetary damages for lost value of the Containers, and sales therefrom, loss of OJC's goodwill and reputation, and charged storage fees on the Containers; in a sum exceeding $75,000, exclusive of interest and costs, and for treble damages, attorney's fees, and reasonable costs, pursuant to N.J.S.A. 56:8-19; pre-judgement interest; costs of this litigation; and any other relief this Court finds just and proper.

### COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT

148.    OJC repeats and realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

149.    OJC entered into agreements with its customers to sell certain products that were contained in the Containers.

150.    Aronov was fully aware of those agreements, as OJC specifically advised him multiple times during their business relationship that the products in the Containers were already sold to its customers who had purchased those products for the upcoming holiday season.

151.    Knowing OJC had contracts with its own customers, Aronov intentionally worked with HYC and 562 to wrongfully seize the Containers, to ensure OJC could not fulfill its customer orders.

152.    Aronov's conduct caused OJC to be unable to fulfill its customer contracts, resulting in their cancellation.  A true and correct copy of the list of those orders that were cancelled due to Aronov's tortious interference is hereby attached as **Exhibit F**.

153.    The contracts and customer orders with which Aronov interfered are reflected on the order list attached as **Exhibit F**. These include pre-existing online sales orders placed by OJC's retail customers for holiday delivery in Q4 2022.

154.    Aronov's conduct, as described herein, was also done without justification or

privilege but instead was done with intention, malice, and willfulness.

155.    Aronov's interference was accomplished through independently wrongful acts, including fraud, deception of port authorities, and wrongful seizure of OJC's property, and was therefore not privileged.

156.    As a result, OJC was harmed in the form of lost sales, loss of reputation and good will in a sum exceeding $75,000, exclusive of interest and costs.

157.    Aronov's tortious conduct, as described herein, was done with malice, whereby he intended to cause injury to OJC, and has willfully and consciously disregarded OJC's rights to HYC's economic advantage. Through his fraudulent conduct, Aronov also knowingly acted to cause OJC oppression, as has acted willfully and maliciously in conscious disregard of OJC's rights. Accordingly, OJC is entitled to punitive damages from Aronov for his willful and malicious activities.

158.    Aronov's conduct was wanton and in reckless disregard of a high probability of harm to OJC, satisfying the standard for punitive damages under N.J.S.A. 2A:15-5.12.

WHEREFORE, OJC demands monetary damages for lost sales, and loss of OJC's goodwill and reputation, in a sum exceeding $75,000, exclusive of interest and costs, incidental damages, punitive damages, in an amount to be determined at trial, costs of this litigation, prejudgment interest, and any other relief this Court finds just and proper.

### COUNT V – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

159.    OJC repeats and realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

160.    OJC had a reasonable expectation of an economic benefit or advantage, in selling the products contained in the Containers to its customers.

161.     Aronov was fully aware of these expectancies and advantages, as OJC specifically advised him multiple times during their business relationship that the products in those Containers were already sold to its customers who had purchased those products for the upcoming holiday season.

162.     Additionally, Aronov was fully aware that OJC is an internet retailer, and all of the products it imports into the United States are for purposes of reselling those products to its customers.

163.     Aronov worked with representatives of HYC and 562 to take possession of those Containers in an unauthorized and deceptive manner, as described herein.

164.     Aronov's intentional conduct caused OJC to lose prospective sales opportunities and customer relationships and the termination of the agreements that OJC had with its customers.

165.     Aronov's conduct, as described herein, was also done without justification or privilege but instead was done with intention, malice, and willfulness.

166.     As a result, OJC was harmed in the form of lost sales, loss of reputation and good will in a sum exceeding $75,000, exclusive of interest and costs.

167.     The contracts and customer orders with which Aronov interfered are reflected on the order list attached as **Exhibit F**. These include pre-existing online sales orders placed by OJC's retail customers for holiday delivery in Q4 2022.

168.     Aronov's interference was accomplished through independently wrongful acts, including fraud, deception of port authorities, and wrongful seizure of OJC's property, and was therefore not privileged.

169.     Aronov's tortious conduct, as described herein, was done with malice, whereby he

intended to cause injury to OJC, and has willfully and consciously disregarded OJC's rights to HYC's economic advantage. Through his fraudulent conduct, Aronov also knowingly acted to cause OJC oppression, as has cruelly and unjustly robbed OJC of its economic advantage. Accordingly, OJC is entitled to punitive damages from Aronov for his fraudulent activities.

170.    Aronov's conduct was wanton and in reckless disregard of a high probability of harm to OJC, satisfying the standard for punitive damages under N.J.S.A. 2A:15-5.12.

WHEREFORE, OJC demands monetary damages for lost sales, and loss of OJC's goodwill and reputation, in a sum exceeding $75,000, exclusive of interest and costs, incidental damages, punitive damages, in an amount to be determined at trial, costs of this litigation, prejudgment interest, and any other relief this Court finds just and proper.

### COUNT VI – AIDING AND ABETTING TORTIOUS CONDUCT

171.    OJC repeats and realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

172.    HYC and 562 committed wrongful acts against OJC.

173.    The wrongful acts included the fraudulent billing of fabricated fees to OJC.

174.    The wrongful acts also included unfairly, fraudulently and deceptively taking possession of OJC's Containers, as described herein, and then demanding payment for the fabricated fees.

175.    Aronov was fully aware of and personally participated in HYC's wrongful acts.

176.    Aronov aided and abetted HYC and 562 in the commission of their wrongful acts by actively participating in the deception regarding the fraudulent fees.

177.    Aronov also aided and abetted HYC and 562 in their wrongful acts by actively participating in deceiving the ports and OJC in order to take possession of OJC's Containers.

178.     Aronov's conduct, as described herein, was also done with intention, malice, and willfulness.

179.     HYC and 562, as separate entities, committed independent torts against OJC, including fraudulent billing and wrongful detention of OJC's property. With actual knowledge of those torts, Aronov substantially assisted them by directing fraudulent billing practices, instructing 562 to retrieve and hold the Containers, and coordinating communications with the ports, thereby aiding and abetting their wrongful conduct.

180.     OJC was injured in the form of lost sales and loss of OJC's goodwill and reputation.

181.     OJC was also injured in the form of storage fees charged by HYC.

182.     Aronov's tortious conduct, as described herein, was done with malice, as he intended to cause injury to OJC and willfully disregarded OJC's rights for his own economic advantage. Through his fraudulent conduct, Aronov knowingly acted to oppress OJC by depriving it of the contents of its Containers and causing significant overbilling. Accordingly, OJC is entitled to punitive damages from Itamar Aronov for his willful and malicious  activities.

183.     Aronov's conduct was wanton and in reckless disregard of a high probability of harm to OJC, satisfying the standard for punitive damages under N.J.S.A. 2A:15-5.12.

WHEREFORE, OJC demands monetary damages for lost sales, and loss of OJC's goodwill and reputation, in a sum exceeding $75,000, exclusive of interest and costs, incidental damages, punitive damages, in an amount to be determined at trial, costs of this litigation, prejudgment interest, and any other relief this Court finds just and proper.

**OJC DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

**PRAYER FOR RELIEF**

WHEREFORE, OJC respectfully demands the following relief:

a.      Judgment against Aronov on all of its claims;

b.      Judgment in favor of OJC on its claims, in an amount to be determined at trial but in a sum exceeding $75,000, exclusive of interest and costs;

c.      Award OJC treble damages pursuant to N.J.S.A. 56:8-19, and punitive damages, in an amount to be determined at trial, as authorized by N.J.S.A. 2A:15-5.14;

d.      Award of OJC's attorneys' fees and costs, pursuant to N.J.S.A. 56:8-19, and any other applicable law;

e.      Award pre- and post-judgment interest, as allowed by law;

f.      Award OJC's costs incurred in obtaining judgment against Aronov; and

g.      Award such other relief as the Court considers just and proper.


Dated:  January 13, 2026                         Respectfully submitted,

                                                 By: /s/ Shlomo Y. Hecht
                                                 Shlomo Y. Hecht
                                                 NJ Bar No. 445402024
                                                 Shlomo Y. Hecht, P.A.
                                                 3076 N Commerce Parkway
                                                 Miramar, FL 33025
                                                 Phone: 954-861-0025
                                                 Email: sam@hechtlawpa.com
                                                 **Attorney for OJCommerce, LLC**